2024 IL App (1st) 22-0394-U

SIXTH DIVISION
March 1, 2024

No. 1-22-0394

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| In re the Former Marriage of | ) | |
| | ) | Appeal from the |
| ELIZABETH SKALLA | ) | Circuit Court of |
| | ) | Cook County |
| Petitioner-Appellee, | ) | |
| | ) | No. 2006 D 9832 |
| v. | ) | |
| | ) | The Honorable |
| JOHN SKALLA, | ) | James Shapiro, |
| | ) | Judge Presiding. |
| Respondent-Appellant. | | |

JUSTICE TAILOR delivered the judgment of the court.
Justices Hyman and C.A. Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*: The judgment of the trial court is affirmed. The trial court did not abuse its discretion when it granted Elizabeth's petition for contribution to final fees and costs.

¶ 2                                   I. BACKGROUND

¶ 3    Elizabeth and John Skalla were married on September 5, 1981, and they had three children together. They divorced on October 8, 2008, after 27 years of marriage. A Marital Settlement Agreement (MSA) was incorporated into a final judgment, and under the terms of the MSA, John

was required to pay $6,500 per month as maintenance to Elizabeth, an amount that was "[r]eviewable and modifiable." At the time, John earned approximately $230,000 a year.

¶ 4   On November 13, 2019, John filed a Petition to Modify Maintenance and Other Relief, asking the court to reduce his maintenance obligation. On October 8, 2020, the court reduced John's maintenance payments to Elizabeth to $5,000 per month pending an evidentiary hearing on John's petition.

¶ 5   On April 27, 2021, the trial court set John's Petition for hearing. After the parties could not reach a settlement, a trial was held on May 13 and 14, 2021. The court heard testimony from John, Elizabeth, and Elizabeth's expert witness, James Godbout.

¶ 6   Elizabeth was 64 years old at the time of trial and was still living in the same home she had shared with John and her children. After she gave birth to her first child, she and John agreed that she would stay home and be a full-time parent. In 2009, one year after the divorce, Elizabeth obtained employment at Lake Lodge Associates as an assistant to the owner, where her salary ranged from $64,000 to $85,000 a year. In November of 2019, Elizabeth was informed that Lake Lodge was closing and that she would no longer have a job after things wound down. She continued to work full-time for Lake Lodge in 2020, but by 2021, there were only a few "straggling activities" left that needed to be handled. Her employment with Lake Lodge ended in January of 2021. Elizabeth put together a resume and applied for several different jobs, and she continued to search for jobs online until the time of trial.

¶ 7   In approximately 2016, Elizabeth took a side job as a salesperson for Portraits, Inc., a company that represents artists and finds buyers for their work. Her income from Portraits, which was based solely on commission, ranged from $6,000 to $30,000 per year. She paid taxes on that

income as well as the monthly maintenance she received from John, so her post-tax income was lower. Elizabeth hoped to turn her work at Portraits into a full-time job.

¶ 8     After Elizabeth's maintenance payments were reduced from $6,500 to $5,000 in October of 2020 and she was nearing the end of her employment with Lake Lodge, she had to "cut back on a lot." She eliminated her landline telephone and cable subscription, cut back on groceries, and spent less on the "perks" she had enjoyed before, such as entertainment, gifts, and clothing. She had to refinance her home in order to pay the outstanding fees she owed to the attorneys who had handled her divorce. She still owed a sizeable sum on her mortgage, and had outstanding credit card debt of around $10,000. Even with the gift of $100,000 Elizabeth received from her mother in November of 2019, Elizabeth owed substantial fees to her attorneys and her expert, and she could not afford to pay these fees without liquidating assets.

¶ 9     John was 66 years old and worked for First Benefits Corporation (FBC), a medical insurance company he started in 1982, shortly after his marriage to Elizabeth. He is and has always been the sole owner of the company, and it currently has three employees other than John. His employees earn roughly $50,000 to $105,000 per year, and the company subsidizes benefits for these employees, including John's. In 2020, FBC had gross revenue of $599,948.22, slightly more than the previous year.

¶ 10     According to John's tax and business records, he earned roughly $243,883 in 2020. FBC purchased the Land Rover vehicle that John drives, and pays for expenses such as fuel, vehicle repairs and maintenance. FBC also pays for John's membership to the University Club, a private club in Chicago. In 2020, the dues for the University Club totaled $7,888.87. FBC also paid for tickets to Chicago Blackhawks games attended by FBC clients. John is also a member of the Glen View country club in Glenview.

¶ 11    Expert witness James Godbout testified on behalf of Elizabeth. He is certified as a valuation analyst, divorce financial analyst, fraud examiner, and financial planner. He reviewed a number of documents before trial, including individual and corporate tax returns, W-2 statements, 1099 statements, the original MSA, credit card and bank statement information, and the financial records of FBC. He prepared a report regarding John's income that was admitted into evidence at trial, but that report was not made part of the record on appeal. Godbout explained that under the terms of the MSA, John was able achieve a tax benefit by deducting his monthly maintenance payments to Elizabeth, whereas Elizabeth had to pay income taxes on those funds. He also explained that because certain expenses had been allocated to FBC, including the dues to the University Club, the money to purchase the vehicle, automobile-related expenses, and pay for a Medicare supplement, John did not personally have to pay income tax on those expenses. As a result, John was in essence receiving "tax-free benefits." Godbout explained that attributing these expenses to FBC lowered John's reported taxable income and therefore had the effect of increasing his cash flow.

¶ 12    On August 19, 2021, the parties entered an agreed order reflecting the admission of a number of exhibits into evidence. The agreed order also stated that "the Court may consider and utilize any and all Exhibits tendered to the Court, even if not set specifically forth above." None of these exhibits except for the financial affidavits prepared by the parties are contained in the record on appeal, however.

¶ 13    On May 4, 2021, Elizabeth filed a Petition for Contribution to Fees and Costs. She argued that due to her current income and situation, she should not have to use her income or assets to pay her legal fees. She said she already paid her attorneys $20,609.63, owed them $32,342.00 in outstanding fees, and expected to incur additional legal fees in connection with the ongoing

litigation. She asked that John be ordered to pay the outstanding balance and contribute to any additional legal fees she would incur. On July 23, 2021, after the two-day trial, Elizabeth supplemented her fee petition, noting that she now owed her attorneys $62,201.85 The trial court heard argument from the parties on Elizabeth's fee petition on July 26, 2021, but a transcript of this hearing is not included in the record on appeal.

¶ 14    On October 1, 2021, the court issued its memorandum opinion and order, addressing both John's Petition to Modify and Elizabeth's Fee Petition. The court denied John's petition to modify maintenance any further, finding that a reduction from $6,500 to $5,000 per month was enough, and ordered John to contribute $50,000 to Elizabeth's attorneys' fees. The court noted Elizabeth was 64 years old at the time of the hearing and had been a stay-at-home parent for the majority of her marriage to John. Although Elizabeth had managed to obtain employment at Lake Lodge Associates after the divorce, her job ended in January 2021 and she had been unable to obtain a job with a comparable salary despite her efforts to do so. The court noted that although Elizabeth had obtained a new job, her income had declined due to the COVID-19 pandemic; in addition, it found her credible. The court noted that John was 67 years old, and that his company, FBC, "did better in a pandemic year than a non-pandemic year." The court found John "not very credible" in part due to the timing of his motion to modify. It noted that John filed the petition when his company was doing well whereas Elizabeth "was in the process of losing her long-time steady employment." The court also noted that Godbout's testimony "was both credible and unrebutted," and that his testimony "strongly support[ed] the continuation of maintenance." Turning to attorney fees, the court noted that "[t]he granting of attorney fees in a divorce case is proper when there is a showing of financial inability of one party to pay fees and ability of the other to do so." It also noted that "[f]inancial inability exists when payment would strip a party of his or her means of

support and would undermine his or her economic stability, but it does not require the party to show destitution."

¶ 15    The court found that Elizabeth "proved her financial inability to pay for her attorneys' fees through her financial affidavit" whereas John "remains in a position of financial stability as he consistently makes well over $200,000/year." Therefore, the court ordered John to contribute the sum of $50,000 to Elizabeth's attorney fees.

¶ 16    On October 22, 2021, John sought reconsideration of the trial court's ruling, arguing that the parties earned comparable income and that Elizabeth possessed over $200,000 in financial accounts and a 401(k) retirement account. Elizabeth argued in response that she should not have to mortgage her home, liquidate her savings, or dip into her retirement to pay her legal fees, and that John possessed a far greater ability to earn an income than she did.

¶ 17    On February 15, 2022, after a hearing on John's motion to reconsider, the trial court denied John's motion. This appeal followed.

¶ 18                                    II. ANALYSIS

¶ 19    A. Jurisdiction

¶ 20    John timely appealed the trial court's final judgment, so we have jurisdiction to review this appeal under Illinois Supreme Court Rules 301 and 303. Ill. Sup. Ct. R. 301 (West 2022); Ill. Sup. Ct. R. 303 (West 2022).

¶ 21    John essentially raises a single issue on appeal, arguing that the trial court abused its discretion when it granted Elizabeth's Petition for Contribution to Final Fees and Costs and ordered him to pay the sum of $50,000 towards her attorney fees.

¶ 22    We review a trial court's decision to award attorney fees for an abuse of discretion. *In re Marriage of Heindl,* 2014 IL App (2d) 130198, ¶ 28. We will not reverse the trial court's decision

unless it was "arbitrary, fanciful, or unreasonable," or unless "no reasonable person would take the same view." *In re Marriage of Heroy,* 2017 IL 120205, ¶ 24 (internal citations and quotations omitted). We will not substitute our judgment for that of the trial court, and instead, will affirm "if there is any basis [in the record] to support the trial court's findings." *In re Marriage of Ricketts*, 329 Ill. App. 3d 173, 177 (2002).

¶ 23     As an initial matter, Elizabeth argues that we should affirm the trial court's judgment because John failed to provide a complete record on appeal. John failed to include many of the exhibits that were referenced at trial or a transcript of the hearing where the parties argued the merits of Elizabeth's fee petition, which was held on July 26, 2021. However, because the record contains the trial court's written order, in which it explained its reasons for granting Elizabeth's petition, the transcripts from the trial, and the transcript of the hearing on John's motion to reconsider, we find the evidence in the record sufficient for us to reach the merits of John's argument. That being said, we will resolve any doubts that arise from the incompleteness of the record against John. *Foutch v. O'Bryant,* 99 Ill. 2d 389, 392 (1984).

¶ 24     John contends that the trial court abused its discretion when it ordered him to contribute $50,000 towards Elizabeth's attorney fees because Elizabeth's financial resources were "more than sufficient to pay her attorneys' fees, experts' fees, and costs" whereas his "financial security would be severely undermined if required to contribute $50,000 toward Elizabeth's attorney's fees." John further contends that the trial court penalized him for not settling and requesting an evidentiary hearing. However, at a hearing on John's motion to reconsider on January 5, 2022, the court expressly stated, "This is not a trial penalty. I'm not penalizing [you] for going to trial. *** I am going to stand by my previous decision on attorneys' fees." Moreover, John cites no case law to support his position, and instead bases his argument solely on the financial affidavits of the parties

that were completed in February 2020. However, this financial information was outdated by the time of trial in May 2021. Elizabeth's employment with Lake Lodge Associates—where she had earned approximately $85,000 a year—ended in January of 2021, and afterwards, her sole source of income—other than John's maintenance payments—came from Portraits, Inc., where she earned a maximum of $30,000 a year. The court noted that her income from Portraits, Inc. was "greatly fluctuating and uncertain" and that it had "thus far not met [Elizabeth's] reasonable economic needs."

¶ 25    "[A]n award of contribution is appropriate when the petitioning party is unable to pay his or her attorney fees and the other party has an ability to do so." *In re Marriage of Heroy*, 2017 IL 120205, ¶ 5. The court should "apply a list of factors to determine whether one party should be required to contribute to the attorney fees of the other, including the criteria used to divide marital property and award maintenance." *Id.* Section 508 of the Illinois Marriage and Dissolution of Marriage Act (Act) states that "[t]he court *** after due notice and hearing, and after considering the financial resources of the parties, may order any party to pay a reasonable amount for his own or the other party's costs and attorney's fees." 750 ILCS 5/508(a) (West 2022).  It explains that "contribution to attorney's fees and costs may be awarded from the opposing party in accordance with subsection (j) of Section 503 and in any other proceeding under this subsection." *Id.*

¶ 26    Subsection 503(j) of the Act states that "[a]ny award of contribution to one party from the other party shall be based on the criteria for division of marital property under this Section 503 and, if maintenance has been awarded, on the criteria for an award of maintenance under Section 504." 750 ILCS 5/503(j)(2) (West 2022). The criteria for dividing marital property in subsection 503(d) include:

"(1) each party's contribution to the acquisition, preservation, or increase or decrease in value of the marital or non-marital property, including *** the contribution of a spouse as a homemaker or to the family unit ***;

(2) the dissipation by each party of the marital property ***;

(3) the value of the property assigned to each spouse;

(4) the duration of the marriage;

(5) the relevant economic circumstances of each spouse when the division of property is to become effective ***;

(6) any obligations and rights arising from a prior marriage of either party;

(7) any prenuptial or postnuptial agreement of the parties;

(8) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of each of the parties;

(9) the custodial provisions for any children;

(10) whether the apportionment is in lieu of or in addition to maintenance;

(11) the reasonable opportunity of each spouse for future acquisition of capital assets and income; and

(12) the tax consequences of the property division upon the respective economic circumstances of the parties." 750 ILCS 5/503(d) (West 2022).

The criteria for an award of maintenance under subsection 504(a) include:

"(1) the income and property of each party ***;

(2) the needs of each party;

(3) the realistic present and future earning capacity of each party;

(4) any impairment to the present and future earning capacity of the party seeking maintenance due to that party devoting time to domestic duties or having forgone or delayed education, training, employment, or career opportunities due to the marriage;

(5) any impairment to the realistic present and future earning capacity of the party against whom maintenance is sought;

(6) the time necessary to enable the party *** to acquire appropriate education, training, and employment, and whether that party is able to support himself or herself through appropriate employment;

(7) the standard of living established during the marriage;

(8) the duration of the marriage;

(9) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and the needs of each of the parties;

(10) all sources of public and private income ***;

(11) the tax consequences of the property division upon the respective economic circumstances of the parties;

(12) contributions and services by the party seeking maintenance to the education, training, career or career potential, or license of the other spouse;

(13) any valid agreement of the parties; and

(14) and any other factor that the court expressly finds to be just and equitable." 750 ILCS 5/504(a)(1)-(14) (West 2022).

¶ 27    Here, the trial court based its decision to order John to contribute to Elizabeth's attorney fees on many of the statutory factors above, including the fact that Elizabeth had been a stay-at-home parent for the majority of her 27-year marriage to John, and her inability to obtain

employment with a comparable salary after her employment with Lake Lodge Associates ended in 2021 despite her efforts to do so, which may have been due, in part, to the fact that "[m]any employers do not leap to hire people in their 60s." In addition, the court noted that John "remain[ed] in a position of financial stability as he consistently makes well over $200,000/year." After reviewing Elizabeth and John's financials, hearing their testimony, and hearing testimony from Elizabeth's expert witness, the court concluded that Elizabeth had "proved her financial inability to pay for her attorneys' fees" and John's ability to pay and therefore ordered John to contribute $50,000 towards her outstanding attorney fees.

¶ 28    Other courts have reasoned along similar lines. For example, in *In re Marriage of Heroy,* 2017 IL 120205, ¶ 4, an ex-wife filed a petition for contribution to attorney fees from her ex-husband. Although the ex-husband argued that an award for attorney fees is appropriate "only when the party seeking the award is entirely unable to pay and the opposing party has the ability to do so[,]" our supreme court disagreed, reasoning that it was "clear the inability to pay standard was never intended to limit awards of attorney fees to those situations in which a party could show a $0 bank balance." *Id*. ¶¶ 15, 19. It noted that "financial inability does not mean destitution[]" and "the spouse seeking the fees [need not] divest her capital assets, deplete her means of support, or undermine her economic stability in order to pay [the attorney fees]." *Id*. ¶ 19 (internal quotations and citations omitted.) Instead, the court held that "a party is unable to pay if, after consideration of all the relevant statutory factors, the court finds that requiring the party to pay the entirety of the fees would undermine his or her financial stability." *Id.* The circuit court found that the ex-wife received assets valued at almost $5 million at the time of the divorce. *Id*. ¶ 21. However, by the time of the trial on the petition to modify or terminate maintenance, her assets were valued at just over $2 million, the depletion of which was largely due to her payment of attorney fees. *Id*.

The circuit court also found that the ex-wife had "minimal prospects in substantially increasing her retirement account" and minimal capacity for employment. *Id.* It noted that she "had forgone her career to raise the couple's children during the marriage," and "was unlikely to be able to resume her career as a law librarian" due to changes in the industry. *Id.* Because the ex-wife's attorney fees exceeded $1 million, the court found that if she were required to pay the entirety of her fees, "her retirement account, which the court determined could probably not be increased, would be threatened." *Id.* The circuit court also noted that while the ex-husband received assets near $4 million at the time of the divorce, his assets were valued at approximately $5 million by the time of the trial on the petition to modify or terminate maintenance, and he also possessed an interest in his family's business, an investment account valued at almost $1 million, and a retirement account valued at $1.4 million. *Id.* ¶ 22. Therefore, the court found ample support for the conclusion that the ex-husband had the ability to pay at least some of his ex-wife's attorney fees. *Id.* Accordingly, it concluded that the circuit court did not abuse its discretion when it ordered the ex-husband to pay a total of $160,000 towards his ex-wife's attorney fees. *Id.* Compare with *In re Marriage of Haas,* 215 Ill. App. 3d 959, 965 (1991) (finding that the trial court abused its discretion when it failed to order respondent to pay petitioner's attorney fees when it was "clear that [p]etitioner will be unable to pay her attorney fees and costs without depleting part of the marital assets awarded to her" and respondent appeared "able to pay his fees as well as [p]etitioner's fees without depleting assets, based on his income and additional bonuses").

¶ 29    Here, we find that the trial court did not abuse its discretion when it ordered John to contribute $50,000 towards Elizabeth's attorney fees. The court based its decision on many of the statutory factors above, including Elizabeth's age, her financial situation after the loss of her job with Lake Lodge Associates, and her financial prospects, as well as John's continued ability to

earn over $200,000 a year. Because a transcript of the July 26, 2021, hearing where the trial court heard argument from the parties on Elizabeth's fee petition and copies of the exhibits admitted at trial were not included in the record in appeal, we do not know what other evidence the court may have considered. However, because it was John's burden to provide us with a sufficient record on appeal, we will "presume[ ] that the order entered by the trial court was in conformity with [the] law and had a sufficient factual basis[.]" *Foutch v. O'Bryant,* 99 Ill. 2d at 392. Accordingly, we find that the trial court's decision to order John to contribute to Elizabeth's attorney fees is sufficiently supported by evidence in the record.

¶ 30                                         III. CONCLUSION

¶ 31      For the foregoing reasons, the judgment of the trial court is affirmed.

¶ 32      Affirmed.